UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re: HYMAN COMPANIES, INC.,   :     Case No. 09-20523REF

Debtor-in-Possession            :     Chapter 11

# MEMORANDUM OPINION

# I.  INTRODUCTION

Debtor's business is selling high-end costume jewelry and other merchandise from shopping center, mall, and hotel stores and kiosks throughout much of the United States.  The matter currently before me arose from Debtor's attempt to assume numerous leases for locations from which it sells its goods.  One of the leases at issue is with a Marriott hotel and is titled Concession Agreement (both as initially drafted and as later revised and executed, the "Lease").[1]  The Lease provides for the location of a retail sales kiosk in the lobby of the hotel located at Copley Square in Boston, Massachusetts. Three issues underlie the dispute involving Debtor's attempt to assume the Lease.

---

[1] In its brief filed on April 2, 2010 and at all times before mid-April 2010, the hotel variously described the Concession Agreement between itself and Debtor as a "Lease," an "Agreement," and a "Concession Agreement."  In its brief filed on April 16, 2010, the hotel claimed that the agreement is actually a license.  It is not a license; I will refer to the Concession Agreement as a "Lease."

The first issue is the effectiveness of the attempted termination of the Lease in September 2008, about six months before Debtor filed the present Chapter 11 proceeding. The parties had specifically negotiated terms that would control the relationship between them upon the hotel's renovation or reconstruction of its lobby. The renovation/reconstruction of the lobby came to pass and I must therefore interpret that language of the Lease and the actions taken by the parties to the Lease, particularly the actions of the hotel. The second issue is whether Debtor had assigned the Lease to a related, non-debtor entity before it filed this bankruptcy proceeding. No written assignment of the Lease exists. But the hotel presented circumstantial evidence of an assignment. The third issue, which I will answer first, is the order in which I must address the preceding two substantive questions.

First, I conclude that I will consider termination of the Lease as the first substantive issue. Second, I find and conclude that the termination of the Lease in September 2008 was not effected pursuant to the terms of the Lease. Third, I find and conclude that Debtor did not assign the Lease to any other party (related or otherwise). The Lease remains with Debtor as part of its Chapter 11 estate in the status that existed when Debtor filed its bankruptcy petition. In the matter now before me, therefore, I reject the hotel's opposition to Debtor's assumption of the Lease and I will grant Debtor's motion to assume the Lease.

2

# II.  PROCEDURAL BACKGROUND AND FACTUAL HISTORY

## A.  PROCEDURAL BACKGROUND.

Debtor, The Hyman Companies, Inc.,[2] initiated this Chapter 11 reorganization when it filed its petition on March 3, 2009.  On September 16, 2009, in the course of the administration of its estate, Debtor filed the Combined Motion of Debtor for (i) Expedited Consideration, Shortened Time and Limited Notice, and (ii) an Order Pursuant to 11 U.S.C. §365 Authorizing the Assumption of Unexpired Leases of Nonresidential Real Property (the "Assumption Motion").  The Assumption Motion sought approval of Debtor's request and intention to assume numerous leases of space for its stores and kiosks throughout the country.  Chief Judge Stephen Raslavich granted that portion of the Assumption Motion that sought expedited consideration and set a date for me to hear the Assumption Motion on September 24, 2009.[3]

Many of the leases between Debtor and its various lessors were quickly assumed pursuant to the parties' agreements and consent orders filed on and following the

---

[2] Debtor filed as The Hyman Companies, Inc., aka Landau aka The Landau Collection aka Boccelli aka Landau Costume Jewelry and aka Bijou Bijou.

[3] Judge Raslavich ruled on the request for expedited consideration as the District's Emergency Judge because I was out of town when the Assumption Motion was filed.

September 24, 2009 hearing date. On October 9, 2009, I entered a consent order

scheduling a hearing on November 5, 2009, for me to consider the dispute between

Debtor and Marriott Copley,[4] which had filed its objection to the Assumption Motion on

October 30, 2009. The issue raised by the original objection was the effect of Marriott

Copley's pre-petition attempt to terminate the Lease of lobby space to Debtor for its retail

sales kiosk (the "Kiosk"). On November 5, 2009, the hearing on Debtor's dispute with

Marriott Copley was continued to December 18, 2009, the date on which I heard the first

part of this contested matter in an all-day evidentiary hearing.

At the conclusion of the December 18, 2009 hearing, the parties agreed to

file their briefs on the termination issue on January 5, 2010. I suggested that their briefs

address certain issues in particular, although I gave them leave to address any other issues

that they thought were germane. I followed my oral suggestion of the issues to be briefed

with my written Order on December 21, 2009, in which I described certain specific

issues, among any others, that the parties should address.

On January 4, 2010, counsel for Marriott Copley filed a letter in which he

identified a second, completely new and different, issue that Marriott Copley believed

must be determined as part of this dispute. Counsel claimed that they had only very

---

[4] "Marriott Copley" is Marriott Hotel Services d/b/a Boston Marriott Copley Place Hotel,
as hotel manager for HMC Copley LLC. The objection also included opposition to Debtor's
assumption of a lease for space for a kiosk at the Marriott hotel in downtown Philadelphia. On
November 19, 2009, I signed a consent order between the parties that approved Debtor's
assumption of the Philadelphia Marriott lease, which is therefore no longer part of this litigation.

4

recently discovered[5] that the Lease might have been assigned to a non-debtor affiliate of

Debtor, which might therefore render the issue of termination of the Lease beyond my

power and ability to decide. The assignment issue had not been mentioned at all in the

pleadings leading to or during the December 18, 2009 hearing. Debtor immediately

denied and continues to deny that any such assignment exists.[6]   In a telephone conference

among myself and all counsel on January 4, 2010, the parties agreed to conduct discovery

on the assignment issue and to participate in a hearing, if one were necessary, on January

15, 2010. On January 8, 2010, counsel informed me that they had difficulty in completing

discovery; I agreed with their request to continue the assignment hearing to January 29,

2010. Once again, counsel jointly requested that the hearing be continued to February 19,

2010; I agreed. I heard additional testimony and received additional exhibits on the

assignment issue at the second hearing date.

---

[5] Some of the information that led Marriott Copley to the newly discovered assignment
issue had been apparent or on the record in this case for quite some time. Marriott Copley's
ability, however, to put the pieces together apparently arose only after I had entered an order on
December 29, 2009, through which I granted relief from the stay for another Boston hotel to
proceed against an affiliated assignee of Debtor's lease for space at that hotel.

[6]Although no written assignment has been produced, the issue of the possible assignment
raised by Marriott Copley is not a fabricated matter. In addition to the December 29, 2009 Order
recognizing that another of Debtor's leases had been assigned to an affiliate of Debtor, I have
heard and decided a matter in which the determining issue was my finding of the validity of an
assignment of another of Debtor's leases to a related entity.  See Hyman Companies, Inc., v.
Four Winds Casino Resort, Adv. Proc. No. 09-2172 (Order and Statement in Support of Order
Granting Debtor's Motion for Preliminary Injunction, both of which are dated January 13, 2010).
Similarly, Marriott Copley brought forth certain circumstantial evidence of a possible assignment
of the Lease at the hearing on this issue, including Debtor's inclusion of the Lease in Paragraph
10 of the Statement of Financial Affairs as having been transferred before the bankruptcy.

On February 18, 2010, the day before the hearing, the parties raised an issue

that they believed was jurisdictional. The new issue, discussed in more detail below,

related to the order in which I must decide the two substantive issues before me –

termination of the Lease and assignment of the Lease. I established a new briefing

schedule for the two substantive issues and the single jurisdictional issue at the

conclusion of the February 19, 2010 hearing. Through my written Order on February 24,

2010, I again described a specific legal issue, among any other issues, for the parties to

research and brief. I later twice extended the briefing schedule upon the unexpected and

serious illness of a family member of one of the counsel before me. The parties timely

filed their briefs on or before the due dates.

On May 11, 2010, Debtor filed a motion to strike certain exhibits and

arguments presented by Marriott Copley. Following a telephone conference with counsel

in which I listened to their positions and stated mine, I issued a written Order dated May

12, 2010, granting Debtor's motion in part and denying it in part.

In summary, I have decided that I will first determine the Lease termination

issue. I will then address the Lease assignment issue.[7] I have concluded that Marriott

Copley had attempted to terminate the Lease, but that the termination was not done in

accordance with any provision in the Lease. Marriott Copley may therefore be subject to

---

[7] Marriott Copley argues that I must decide the assignment issue first. Because I find and
conclude that the Lease was not assigned, the order in which the two issues are addressed is
academic and irrelevant.

6

Debtor's claim for damages resulting from the attempted termination or for some other

relief.[8]  I have also determined that the Lease has not been assigned and remains property

of the Debtor's estate in this case, subject to the attempted termination by Marriott

Copley.  My analysis and discussion for arriving at these conclusions follows.[9]

---

[8] Debtor has initiated an adversary proceeding arising out of Marriott Copley's attempted termination of the Lease.  The Hyman Companies, Inc., v. Marriott Hotel Services, Inc., Adv. No. 10-2022REF (filed on February 19, 2010).  I will not comment further on possible remedies, leaving it to the pending adversary proceeding.

[9] Because I find and conclude that the Lease has not been assigned, I believe that I could stop my consideration there and simply approve assumption of the Lease entirely subject to its current status under Massachusetts state law, which is in flux.  That is, I could approve assumption of the Lease subject to the pending state court litigation that would then determine the effectiveness and propriety of Marriott Copley's termination under the Lease.  The parties informed me that the state court case on termination of the Lease (Marriott Copley's action for eviction) had started in February 2009, but that only the complaint has been filed.  Before any responsive pleading could be filed, Debtor filed its bankruptcy petition on March 3, 2009.  The automatic stay of Section 362(a), 11 U.S.C. §362(a), thereafter prevented further progress in the state court proceeding.

I choose not to shift the disposition of the termination dispute to the pending state court litigation for four similar reasons.  First, both parties prepared for and presented to me their cases on termination of the Lease at the December 18, 2009 hearing.  Both parties have had a full and fair opportunity to prepare and present testimony and exhibits and to file their legal briefs.  Judicial efficiency, therefore, leads me to decide the termination issue, which has been fully tried and is now ripe before me.

Second, if either of the parties had wanted the state court to determine the Lease termination issue, one or the other of them could/should have sought relief from the automatic stay to allow the state court litigation to proceed at any time after the March 3, 2009 filing date.  To the contrary, the parties spent many hours preparing to try the case before this Court.  They then spent the entire day on December 18, 2009, into the evening, trying the termination issue.  To send the whole termination issue back to state court might require that the parties start over again:  Complete the state court pleadings; conduct possible additional discovery; proceed through possible dispositive motions; and, finally, try the case.

Third, the parties have expressly asked me, through this contested matter, to decide the Lease termination issue.  Both parties agree that I should not leave the termination issue to the state court.  Although I disagree with their conclusion that I may not defer to the pending state court litigation, their mutual desire carries the day on this issue.

This contested matter is a core proceeding, relating to a fundamental issue in the administration of Debtor's reorganization efforts,[10] and is now ripe for my determination. This Opinion contains my findings and analysis of facts, my conclusions of law, and my discussion of the application of the law to the facts.

---

Finally, as mentioned in the preceding footnote, the parties are engaged in an adversary proceeding in this Court in which issues relating to the attempted termination have been raised.

Aware of the potentially wasteful expenditure of the resources of (a) this Court, (b) the state court, and (c) both parties (particularly Debtor, who is trying to reorganize and emerge from its bankruptcy), I will address and decide the Lease termination issue through this contested matter and the pending adversary proceeding, as both parties have requested.

[10] 28 U.S.C. §157(b)(2)(A).

# B. FACTUAL HISTORY.

## 1. Negotiation of the Terms of the Lease (Particularly Section 11).

I find no material deviation in the parties' evidence showing how the Lease,
particularly Section 11, was negotiated and revised from its initial iteration to the final
version executed by the parties.

Some time in or before 2003, Debtor initiated discussions with Marriott
Copley about placing a kiosk in its lobby for the sale of Debtor's high-end costume
jewelry and other merchandise. Debtor prepared the first draft of the Lease, because
Debtor's principal, Mr. Nat L. Hyman ("Mr. Hyman"), had previously negotiated a
similar lease with another Marriott hotel. Debtor sent the first draft of the Lease to
Marriott Copley with its November 24, 2003 letter. The initial verison of the Lease
included the following Section 11:

> 11. <u>Hotel Alterations</u>. If renovation, construction, or other Hotel
> needs necessitates a relocation or closing of the present Premises,
> Operator agrees that Marriott shall have the right to temporarily
> relocate the Operator's business to a comparable premises (with
> rentals proportionately abated).

Exhibit D-1.

On December 3, 2003, following further discussions between the parties,
Debtor sent the Lease to Marriott Copley with the following revised Section 11:

> 11. <u>Hotel Alterations</u>. If a major renovation or reconstruction of

9

the Hotel lobby necessitates a relocation or closing of the present
Premises, Marriott shall use its best efforts to relocate the Operator's
business to a comparable premises (with rentals proportionately
abated).  If a relocation is not possible, then, in such event, Marriott
may terminate this Agreement with sixty (60) days advanced written
notice to Operator, provided that Marriott pays Operator on the day
it vacates the Premises its unamortized investment in the Premises,
based upon a full amortization over the seven year term of this
Agreement.

Exhibit D-2.  Mr. Hyman signed this version of the Lease, but Marriott Copley made

additional changes.

On December 18, 2003, Debtor faxed to Marriott Copley two pages of the

Lease with certain comments and a further revision of Section 11, which revision was

requested by Marriott Copley and consisted only of adding the following sentence at the

end of Section 11: "For purposes of this Section 11, in no event shall Operators [sic]

investment in the Premises be deemed to be in excess of two hundred thousand dollars

($200,000)."  Exhibit D-3.

Debtor revised Section 11 again and faxed a complete version of the Lease

to Marriott Copley on December 31, 2003.  The new Section 11 provided:

11.  Hotel Alterations.  If a major renovation or reconstruction of
the Hotel lobby necessitates a relocation or closing of the present
Premises, Marriott shall use its best efforts to relocate the Operator's
business to a comparable premises (with rentals proportionately
abated).  If a relocation is not possible, then, in such event, Marriott
may terminate this Agreement with sixty (60) days advanced written
notice to Operator, provided that Marriott pays Operator on the day
it vacates the Premises fifty percent (50%) of its unamortized

10

> investment in the Premises, based upon a full amortization over the seven year term of this Agreement. Operator and Marriott hereby agree that, notwithstanding the aforementioned payment, Operator may keep all furniture, fixtures, improvements, casework, etc., it installs in the Premises after the termination or expiration of this lease. For purposes of this Section 11, in no event shall Operators [sic] investment in the Premises be deemed to be in excess of two hundred thousand dollars ($200,000).

Exhibit D-4.

The legal staff of Marriott Copley then revised the Lease and faxed their comments about a number of sections of the Lease to Debtor on February 4, 2004. The legal staff's proposed changes to Section 11 follow:

> 11. <u>Hotel Alterations</u>. If a major renovation or reconstruction of the Hotel lobby necessitates a relocation or closing of the present Premises, Marriott shall use <u>reasonable</u> [its best][11] efforts to relocate the Operator's business to a comparable <u>location within the Hotel</u> [premises] (with rentals proportionately abated). If a relocation is not <u>reasonably</u> possible, then, in such event, Marriott may terminate this Agreement with sixty (60) days advanced written notice to Operator, provided that Marriott pays Operator on the day it vacates the Premises fifty percent (50%) of <u>Operator's</u> [its] unamortized investment in the Premises, based upon a full amortization over the seven year term of this Agreement. Operator and Marriott hereby agree that, notwithstanding the aforementioned payment, Operator may keep all furniture, fixtures, improvements, casework, etc., it installs in the Premises after the termination or expiration of this lease. For purposes of this Section 11, in no event shall Operators [sic] investment in the Premises be deemed to be in excess of two hundred thousand dollars ($200,000).

---

[11] The proposed changes in the Lease were hand-written inserts and cross-outs. <u>Underlined</u> words and phrases represent the inserts; [bracketed] words and phrases represent the cross-outs.

Exhibit D-5.

Mr. Hyman, on either February 4 or 5, 2004, left a telephone message with

his corresponding representative of Marriott Copley, discussing the proposed changes.

On February 5, 2004, Debtor sent a signed version of the Lease with many, but not all, of

the changes proposed by Marriott Copley's legal department.  Section 11 of the Lease, as

finally agreed to and signed by both Debtor and Marriott Copley, provides:

> 11.  <u>Hotel Alterations</u>.  If a major renovation or reconstruction of
> the Hotel lobby necessitates a relocation or closing of the present
> Premises, Marriott shall use its best efforts to relocate the
> Operator's  business to a comparable location within the Hotel
> (with rentals proportionately abated).  If a relocation is not reasonably
> possible, then, in such event, Marriott may terminate this Agreement
> with sixty (60) days advanced written notice to Operator, provided
> that Marriott pays Operator on the day it vacates the Premises fifty
> percent (50%) of Operator's unamortized investment in the Premises,
> based upon a full amortization over the seven year term of this
> Agreement.  Operator and Marriott hereby agree that, notwithstanding
> the aforementioned payment, Operator may keep all furniture, fixtures,
> improvements, casework, etc., it installs in the Premises after the
> termination or expiration of this lease.  For purposes of this Section
> 11, in no event shall Operators [sic] investment in the Premises be
> deemed to be in excess of two hundred thousand dollars ($200,000).

Exhibits D-6 and D-7.

## 2.  <u>Marriott Copley's Attempted Termination of the Lease</u>.

I also find no material deviation in the parties' evidence showing how

Marriott Copley attempted to terminate of the Lease.[12]  By his letter dated September 15,

---

[12] Agreeing to "how" the attempted termination was effected obviously does not equate to
agreeing about the validity of the attempted termination.

2008, David R. Giblin ("Mr. Giblin"), General Manager of the Marriott Copley hotel, sent

a letter to Debtor, through which he attempted to terminate the Lease.  The operative

portions of that letter follow:

> The Boston Copley Marriott will undergo a major renovation and
> re-design of its public space, including the Hotel Lobby with a
> construction commencement of January, 2009.  Marriott is exercising
> its right to terminate the Concession Agreement pursuant to Section
> 11 (Hotel Alterations) of the Agreement.

> This letter shall serve as ninety (90) days prior written notice to
> terminate the Agreement and to surrender the premises, effective
> December 31, 2008.

Exhibit D-9.

As I will discuss at more length below, however, the September 15, 2008

termination was not effected in accordance with any provision of the Lease.[13]  The

Marriott Copley had no "right to terminate" the Lease pursuant to Section 11 or any other

section of the Lease.  The termination letter was sent before, and without, any effort by

Marriott Copley's management, staff, or hired professionals to find a comparable location

for the Kiosk.  Marriott Copley breached the Lease.  Specifically, Marriott Copley did not

terminate the Lease in accordance with its Section 11.  The excerpts from the testimony

and exhibits on which I base this conclusion follow, as findings of fact, in the order in

which they were presented as testimony or exhibits at the December 18, 2009 trial.

---

[13] The Lease does not provide remedies for any breach by Marriott Copley; the matter of
possible remedies may be before me through the adversary proceeding between Debtor and
Marriott Copley.  See footnote 8, supra.

Three witnesses provided the testimony that I rely upon and recount below:

(1.) Mr. Hyman - Chairman and CEO of Debtor; (2.) Mr. Giblin - General Manager of

the Marriott Copley hotel from some time in 2005 through, at least, the December 18,

2009 hearing; and (3.) Mr. James Stanislaski ("Mr. Stanislaski") - Architect who was

primarily responsible for the plans and renovation of the Marriott Copley lobby.  As noted

above, I accept and recount these witnesses' testimony as part of my findings of the facts

of this case.

### a.  Mr. Hyman direct testimony about Exhibit D-9  - September 15, 2008 termination letter from Mr. Giblin to Debtor.

Mr. Hyman had neither discussion with Marriott Copley representatives nor

awareness of the lobby renovation before he received Mr. Giblin's September 15, 2008

termination letter.[14]  Exhibit D-9.  10:13:12 - 10:13:55.[15]

---

[14] Although I do not regard the discrepancy as material, Mr. Hyman contradicted this testimony somewhat in the second hearing, on February 19, 2010.  Mr. Hyman said during the February 19 hearing that he might have heard from his employees, before the September 15, 2008 termination letter, about the possible closing of Debtor's store because of possible construction.

[15] Neither party ordered a written transcript of the proceedings, although counsel for Marriott Copley had a transcript of the CD recordings prepared (apparently by his staff) and submitted to this Court via his affidavit.  He did not include in his affidavit any description of the steps taken to assure that his office's transcription of the testimony was accurate.  To assure that my recollection of the testimony is accurate according to the official record, therefore, I listened a number of times to the CD recordings of the testimony to verify the notes I had taken during the hearings.  For my notations of testimony throughout this Opinion, therefore, I will refer to the specific time of the testimony on the CD recording of the hearing.  The references will be in the format xx:xx:xx for the time of day in hours:minutes:seconds.  In this section II. B. 2., all references to an audio CD are from the December 18, 2009 hearing.  On occasion, I compared my recollection and notations of the testimony made from the CD against the typed transcript filed by Marriott Copley.  In all such comparisons, my recollection and notations from listening

### b.  Excerpts from Holland & Knight letter dated November 13, 2008 - Exhibit D-16.

Counsel for Marriott Copley noted that its client's management had explained and demonstrated, by showing the renovation plans to Debtor, "it is not 'reasonably possible' to relocate the Premises within the Hotel and still meet the renovation requirements and the brand standards." Exhibit D-9.  I reject this conclusion as incorrect and contrary to the other evidence presented to me.

### c.  Excerpts from Mr. Giblin letter dated December 8, 2008 - Exhibit D-20.

The "proposed location [for the Kiosk as suggested by Mr. Hyman in his November 25, 2008 to Mr. Giblin - Exhibit D-19] would interfere with the arrival experience of our guests."  "The proposed location [of the Kiosk as suggested by Mr. Hyman] is also on the only direct path from the front desk to the elevators which would impede traffic flow and maneuvering of bell carts . . .." Exhibit D-20.  Mr. Giblin failed to describe or quantify negative consequences to the hotel arising from the claimed interference with the guests' arrival experience.

### d.  Mr. Hyman testimony on cross examination.

Mr. Hyman first learned about the renovations to the Marriott Copley lobby when he got the September 15, 2008 termination letter.  12:04:05 - 12:04:25.[16]

---

to the CD were accurate, although the typed transcript contains some errors.

[16] But see footnote 14, supra.

### e.  Mr. Hyman re-direct testimony.

No staff or professionals from Marriott Copley spoke with Mr. Hyman to offer any alternative location for the Kiosk.  Nothing in writing, no emails, no plans, no correspondence, and no other communication from anyone at Marriott Copley suggested any possible alternative location of the Kiosk in the plans.  Marriott Copley never proposed a possible relocation site.  12:48:45 - 12:50:20.

### f.  Mr. Giblin testimony as on cross examination about Exhibit D-9 - September 15, 2008 termination letter from Mr. Giblin to Debtor.

Relating to the Kiosk, the Marriott Copley professionals discussed only elimination of all retail space and had no discussion about maintaining or relocating the Kiosk in particular.  Marriott Copley decided that its lobby space was at a premium for essential services and traffic flow and would not accommodate any retail.  Marriott Copley made no effort to relocate the Kiosk before sending the September 15, 2008 termination letter.  Marriott Copley had not asked its architect, before or after September 15, 2008, to try to relocate or place the Kiosk anywhere in the hotel.  01:45:45 - 01:48:30.

Mr. Giblin knows of nothing that would indicate that the Lease had not been reviewed by Marriott Copley's legal staff, despite his counsel's implication in his examination of Mr. Hyman that Mr. Hyman had sneaked a change in Section 11 past Marriott Copley.  01:48:55 - 01:49:26.  Marriott Copley looked at many floor plans for the renovations before September 15, 2008, until it agreed to the final version, none of

16

which plans provided space for the Kiosk.  01:49:27 - 01:49:51.  Marriott Copley

management, staff, and professionals had discussed the Kiosk before September 15, 2008,

only insofar as they erroneously believed that the Lease had a buyout clause that would

allow Marriott Copley to terminate the Lease unilaterally upon payment of some

liquidated amount.  01:50:27 - 01:51:00.  The Marriott professionals considered only

plans that comported with the "Marriott brand" standards and provided essential services.

Marriott Copley personnel never told the architect that it was obligated to attempt to find

a suitable location for the Kiosk.  01:58:10 - 01:59:00.

### g.  Excerpts from Exhibit D-11 - September 23, 2008 letter from Mr. Giblin to Debtor and Mr. Giblin testimony as on cross examination about Exhibit D-11.

"After many reviews of layouts and options it is apparent that we need to

dedicate our limited space to vital guest services."  Exhibit D-11.  "After careful review

of first and second floor space we do not have comparable space available to offer you."

Exhibit D-11.  These excerpts are false statements.  Marriott Copley made no new (or

careful) review of its plans to find comparable space for the Kiosk before or after the

September 15, 2008 termination letter had been sent to Debtor.  To the contrary, Mr.

Giblin relied solely on what Marriott Copley had previously done and had previously

considered (which was nothing) when he had originally sent the termination letter.

02:08:15 - 02:09:20.  Marriott Copley did not accommodate the Kiosk in its plans because

it was not in the interests of Marriott Copley or its guests.  02:09:25 - 02:10:00.  Mr.

17

Giblin thought that Marriott Copley had a buyout in place for the Lease and could

unilaterally exercise the buyout with no further obligation to Debtor beyond the liquidated

damages provided in Section 11 of the Lease. Mr. Giblin determined that Marriott

Copley had a right to a buyout, so he did not ask what was required by "best efforts" or

"reasonably possible." Mr. Giblin was not aware that the phrase "reasonable efforts" had

been removed from Section 11 of the Lease and "best efforts" had replaced it. 02:12:25 -

02:13:30.

### h. Mr. Giblin testimony as on cross examination.

The arrival experience, the hustle and bustle of guests and others, was a

focus of Marriott Copley. Hustle and bustle are immutable, inescapable parts of a hotel in

which guests, bell carts, and other traffic move about a hotel lobby. 02:21:35 - 02:22:15.

### i. Mr. Giblin testimony as on cross examination about Exhibit D-28 - Description of the visioning process for the lobby renovation.

The lobby renovation was contemplated before May 2007. The visioning

process had started in 2006 or so, which was about a year after Mr. Giblin started as the

manager of Marriott Copley in 2005. The visioning process made no reference to or

mention of the Kiosk. 02:24:03 - 02:26:30.

### j. Mr. Giblin testimony as on cross examination about Exhibit D-30 - March 20, 2008 memorandum about the lobby renovation.

18

Marriott Copley wanted additional meeting space and return on its

investment for that meeting space.  The Kiosk was not identified as an existing feature of

the lobby.  The March 20, 2008 memorandum, Exhibit D-30, makes no reference to any

effort to relocate the Kiosk in the lobby.   02:26:50 - 02:27:45.

### k.  Mr. Giblin testimony as on cross examination about Exhibit D-36 - a December 21, 2007, accounting of the existing square feet taken by objects in lobby pre-renovation.

The schedule of existing space purported to include everything in the lobby

before renovation, but it omitted the Kiosk. 02:30:00 - 02:30:55.

### l.  Mr. Giblin testimony as on cross examination.

The Marriott Copley staff and professionals did not discuss the Kiosk or

whether it might be consistent with its renovations.   Mr. Giblin discussed the Kiosk and

the buyout in the Lease with two Host[17] representatives before sending the September 15,

2008 termination letter.  They discussed that the buyout in Section 11 of the Lease was a

positive feature that they could exercise as an option.  Before September 15, 2008, Mr.

Giblin generally discussed with Host management whether retail space would be

amenable and whether Host wanted retail space if it could be accommodated.  They

decided that the lobby would have no retail space. 02:31:20 - 02:34:40.

### m.  Mr. Giblin direct testimony.

---

[17] Host owns the hotel; Marriott Copley manages it.

Marriott Copley and Host were trying to attract more groups who might schedule in-house meetings that would be self-contained or meetings from events in the nearby Heinz convention center. 02:44:00 - 02:44:50. To get more break-out space and meeting space, Marriott Copley was willing to reduce the lobby size. Management wanted to reposition the hotel with a new make-over and upgrade. 02:54:35 - 02:56:25.

### n.  Mr. Giblin direct testimony.

Prior to the renovation, Marriott Copley professionals discussed retail space but had no discussion about relocating the Kiosk because they believed they had a buyout clause in the lease. 03:10:24 - 03:10:45. Mr. Giblin testified erroneously[18] that Mr. Hyman never disputed the factual reasons given for the September 15, 2008 attempted termination. 03:11:40 - 03:12:05.

### o.  Mr. Giblin direct testimony about Exhibit M-24 (tab 23 in Marriott Copley exhibit binder) - December 11, 2008 letter from Mr. Hyman to Marriott Copley.

After he received the December 11, 2008 letter from Mr. Hyman (Exhibit M-24, tab 23 in Marriott Copley exhibit binder), Mr. Giblin looked at the existing plans with Marriott Copley's architect (Mr. Stanislaski) and determined that they could not relocate the Kiosk in any of the five locations suggested by Mr. Hyman. 03:24:10 - 03:36:15.

---

[18] Mr. Hyman immediately disputed and questioned the termination and the facts on which it was based in his letter to Marriott Copley dated September 17, 2008. Exhibit D-10.

### p.  Mr. Giblin testimony as on cross examination.

After he received the five suggestions from Mr. Hyman for relocating the

Kiosk, Mr. Giblin walked around the lobby with the project engineer[19] and the property

manager to look at Mr. Hyman's suggested relocations.  Mr. Giblin did not include the

architect on the walk because he had already spoken with the architect about fitting the

suggested relocations into the plans.  Very early in its planning, Marriott Copley had

decided that no space would be available for retail, whether for Debtor or otherwise.  Mr.

Giblin had not asked the architect to include any possible relocation of the Kiosk in the

plans.  04:06:20 - 04:08:00.

### q.  Mr. Stanislaski testimony as on cross examination.

Mr. Stanislaski had never been asked to prepare any lobby plans that

included the Kiosk or any other retail space.  It would have been much easier for Marriott

Copley to have relocated the Kiosk if it had attempted to do so before the plans were in

final form.  When the final lobby renovation drawings were complete, the "die was cast"

for what the lobby would look like.  The plans and drawings were finally completed

around December 2008.  But from September to December, only minor changes were

made to the plans, i.e., the architectural staff reworked the drawings from less detailed to

---

[19] Mr. Giblin's testimony on this matter was confusing and somewhat contradictory.
First, he said his walk around to review Mr. Hyman's suggestions included the project engineer.
Moments later, he said that he had merely consulted the engineer on at least one of the
suggestions.

full construction documents.    From September to December 2008, the changes in the

drawings were limited to fine detail items such as millwork, furnishings, and finishes.

From September to December 2008, no major programmatic changes were made to the

plans.  Mr. Stanislaski recalled no structural changes in the plans, such as moving a wall

or changing the meeting or pre-meeting space, after September 2008.  04:24:45 -

04:27:17.

        Mr. Stanislaski "made absolutely zero effort to try to redraw any portion of

the plan to accommodate the Kiosk," after Mr. Hyman sent his five suggestions for

relocating the Kiosk.  04:30:36 - 04:30:43.  When asked if he thought that simply

reviewing Mr. Hyman's suggestions, without trying to fit the Kiosk into the plans

anywhere, was the best he could do, Mr. Stanislaski responded, "I felt after looking at

those options, none of them were viable so it was not worth the time to try to fit a round

peg in a square hole."  04:30:44 - 04:30:56.

        Mr. Stanislaski did not consider keeping the Kiosk in the same place by

reducing its size from three or four feet wide to 30 inches wide.  He was responding only

to Mr. Hyman's suggestions.  Because he had been told not to accommodate retail in the

lobby, Mr. Stanislaski did not try to find a place where the Kiosk could be relocated.  Any

consideration Mr. Stanislaski gave to Mr. Hyman's suggestions was colored by the

direction from Marriott Copley that no retail stores were to go into the lobby.  The

architect was directed to have no retail in the lobby because of its small size.  Later

22

discussions about relocating the Kiosk were merely an exercise because Marriott Copley

had already decided that no retail would be in the lobby. 04:51:20 - 04:53:20.

Moving a wall or reducing the size of a meeting room would be contrary to

the major charge that the architects had been given at the inception of the project, which

was to maximize meeting space. Moving a wall to reduce the square footage of the

meeting rooms would violate Marriott Copley's desire for more meeting room, which was

important to Marriott Copley. 05:02:55 - 05:02:20.

## 3. Debtor's Alleged Assignment of the Lease.

### a. Facts relating to the attempted assignment of the Lease.

At some time in Spring 2008, Mr. Hyman decided that Debtor should

consider moving many of its leases for retail space into certain newly created, affiliated

entities, such as Landau Casino, Inc., Landau Hotel, Inc. ("Landau Hotel"), and Landau,

Inc. ("Landau"). 02:09:40 - 02:09:48; 02:10:30: - 02:12:17; and 02:36:30 - 02:37:22.[20]

None of the affiliated entities are in bankruptcy and none are co-debtors with Debtor in

this Chapter 11 proceeding. 02:16:27 - 02:16:40. In early October 2008, Mr. Hyman

executed, on behalf of Debtor, numerous assignments of the leases for many of Debtor's

retail stores to Debtor's affiliates. 02:38:49 - 02:39:25. Debtor intended to assign only

those leases that were not the subject of pending litigation or lease disputes. 02:37:22 -

---

[20] References to the audio CD are in the format, xx:xx:xx for hours:minutes;seconds; see
footnote 15, supra. In this Section II. B. 3., all references to the CD are from the February 19,
2010 hearing.

02:41:07; 02:41:35 - 02:42:00. If a lease was the subject of litigation or if litigation was

threatened, Debtor retained the lease. Mr. Hyman was anticipating Debtor's possible

need to file bankruptcy and wanted all lease litigation to be stayed by the automatic stay

of Section 362. 02:37:30 - 02:38:45. Mr. Hyman did not execute written assignments of

any of the litigated or problematic leases, including the Marriott Copley Lease. 02:40:00

- 02:41:07.

When pressed on cross-examination, Mr. Hyman testified that, anything

being possible, it is possible that he might have signed an assignment of the Lease. He

stressed, however, that he did not remember executing an assignment of the Lease, he did

not intend to execute an assignment of the Lease, and he had told his subordinates and

attorneys that the Lease was not to be assigned. Debtor has no written assignment of the

Lease in its records. 02:55:24 - 02:56:44.  In response to a subpoena from Marriott

Copley, Debtor searched its records and asked its non-bankruptcy counsel to provide

copies of all assignment documents to its bankruptcy counsel to produce to Marriott

Copley. 03:00:27 - 03:01:01. No assignment of the Lease was produced. As noted

above, I find and conclude that Debtor did not execute any assignment of the Lease to any

affiliate or other party.

Mr. Hyman testified credibly that Debtor did not intend to assign the Lease

with Marriott Copley and did not sign any assignment instrument. Mr. Hyman conceded

that Debtor's books and records and many other documents might indicate such an

assignment. But Mr. Hyman referred to such books, records, and other documents as

mistakes. 02:28:06 - 02:28:42; 02:42:27 - 02-43:23; 02:55:25 - 02:58:37; and 02:59:33 -

03:00:00.[21]

Marriott Copley's attempt to establish that the Lease was assigned is based

entirely on circumstantial evidence. Mr. Hyman signed the Statement of Financial

Affairs, which included in its Paragraph 10(a) an exhibit that referred to the Lease as

having been transferred to Landau Hotel. 02:31:45 - 02:36:22; Exhibit M-44. After the

October 2008 assignments of some of Debtor's leases, many inter-company transfers took

place that mixed together the accounting of the finances and performance of Debtor's

stores. The revenue from each store was transferred to Landau in some amount and to

Debtor in some amount. 02:27:37 - 02:28:06. Landau was the paymaster for all of the

related companies; Landau paid the rent for the Lease; descriptions of Landau Hotel's

financial performance included performance under the Lease at Marriott Copley; Debtor's

payment for the jewelry and merchandise for the Kiosk was attributed to Landau Hotel;

---

[21] Counsel for Marriott Copley implied that Debtor should have brought other witnesses to corroborate Mr. Hyman's testimony about the mistakes. Mr. Hyman, as the principal of Debtor, acknowledged at least twice that the numerous references to an assignment of the Lease in Debtor's books and records were mistakes resulting from Debtor's internal miscommunication. Counsel's implication cuts both ways. Debtor did not produce any other witness, but Marriott Copley could have deposed and examined any number of Debtor's officers and personnel about the alleged assignment. Marriott Copley could also have subpoenaed other employees of Debtor's to appear at the hearing and testify. It did not do so. I do not infer any diminution of Mr. Hyman's credibility merely because only he testified. To the contrary, on the record before me and upon my ability to observe Mr. Hyman as he testified, I find him to be credible.

taxes for the Marriott Copley store were paid by Landau and attributed to Landau Hotel;

all wages and benefits for the employees who work at the Kiosk are paid by Debtor; a

"doing-business-as" certificate for operation of the Kiosk was filed by Landau Hotel.

02:12:17 - 02:31:45; Exhibits M-41, M-42, and M-43.

This hodge-podge of affiliated companies' responsibilities and divisions of

administrative functions does not point to Landau Hotel as the assignee of the Lease. The

inter-company transactions and transfers were symptomatic of the way Debtor and its

affiliates conducted their business among all of their stores and does not prove any

assignment of the Lease. I find and conclude that Debtor did not assign the Lease to any

affiliate or other party.

### b.  Facts related to the approach of the United States Trustee and the Official Committee of Unsecured Creditors to the assignment of the Lease.

Twice during the hearing on this matter, Debtor or its counsel referred to

the position of the Official Committee of Unsecured Creditors and how they viewed the

assignment of leases, which had been undertaken by Debtor shortly before it filed its

petition seeking relief under Chapter 11 of the Bankruptcy Code. First, counsel for

Debtor noted that the Committee believed that the spun-off leases should be brought back

into the estate, and that the parties' plan negotiations would resolve the issue. 02:03:04 -

02:03:58. Second, Mr. Hyman testified that the Committee believed that the non-debtor

affiliates who had received the spun-off leases should be part of the bankruptcy process.

26

02:16:27 - 02:16:40.

These references reflect the position of both the Committee and the United

States Trustee as announced previously in numerous other aspects of this Chapter 11 case.

In a prior decision in an adversary proceeding, I found and concluded that a lease

assigned by Debtor to a non-debtor affiliate remained an integral part of Debtor's

bankruptcy reorganization efforts. At that time, the United States Trustee and the

Committee had orally objected to all pre-petition transfers of leases and had required that

the revenue of all such leases be pledged to Debtor for payments to its creditors as part of

the plan of reorganization.[22]  Similarly, for the past five months, the United States Trustee

has reported, at a number of hearings on this case, that she and the Committee have

required that all revenue from the assigned leases shall be paid to Debtor to fund a plan.

More telling is the plan of reorganization being drafted by Debtor and the

Official Committee and due to be filed within a couple weeks.  The Court has been

---

[22] Statement Supporting Order Dated January 13, 2010, Granting Debtor's Request for Preliminary Injunction, Adv. Proc. No. 09-2172, pp. 3 - 4 (January 13, 2010).  In footnote 14, I explained:

> The revenue from the [assigned] lease will be used to fund Debtor's plan of reorganization. Mr. Hyman's uncontradicted testimony in the January 11, 2010 hearing was that the United States Trustee and the Official Committee of Unsecured Creditors in this Chapter 11 proceeding both pressed for an informal amalgamation of the businesses of Debtor and its non-Debtor affiliates. The non-Debtor affiliates had been spun off from Debtor in late 2008, only a few months before Debtor filed its bankruptcy petition. Rather than engage in costly litigation to undo the spin off, Debtor, the United States Trustee, and the Committee have agreed that the revenues enjoyed by the spun off affiliates will be paid into the plan for distribution to Debtor's creditors through its reorganization.

27

informed by Debtor and the United States Trustee that the plan will require that revenue

from all of Debtors affiliates be paid to Debtor (or, more likely, to a disbursing agent) to

fund the plan. Even if the Lease had been assigned to Landau Hotel, therefore, its

revenue would be part of Debtor's estate for the purpose of this reorganization.[23]

---

[23] Although the confirmation process is nascent, inclusion of the revenue of the affiliates
will very likely not change. The inclusion of the affiliates' revenue benefits every other party in
interest in this case, other than Mr. Hyman and the affiliates. But they had agreed long ago to
include the affiliates' revenue to avoid fraudulent transfer litigation. They cannot now undo that
component of the proposed ANTICIPATED plan.

# III.  DISCUSSION

## A.  REVIEW OF APPLICABLE LAW.

### 1.  Jurisdiction:  May/Must I Address the Termination Issue or the Assignment Issue First?

The question of which substantive issue I should decide first is purely academic because I have determined that the Lease was not assigned to Landau Hotel or to any other entity.  Nevertheless, were I to decide the substantive question about the assignment differently, I would nevertheless believe that the issue of when I should determine the assignment of the Lease would be academic.  I conclude below that the Lease was not terminated in accordance with any of its provisions.  Whether Debtor or Landau Hotel "own" (1) the remaining revenue from the Lease, (2) the right to damages from its termination (if any), or (3) both does not impact the estate.  As I noted above, the insistence of the United States Trustee and the Committee have led to the pledge of revenue to Debtor by any and all of Debtor's affiliates to whom a lease was assigned pre-petition.  Debtor's plan is at least partially funded by the affiliates paying to the estate all or a substantial portion of their revenue each year that Debtor's plan is in effect.

Were I to conclude that the Lease had been terminated correctly and that the Debtor could be evicted, the conditional, liquidated damages provisions of Section 11 of

29

the Lease would be paid to Debtor's estate to fund a portion of the plan. On the other

hand, the continuing revenue stream and damages (if any) that might result from an

improper attempt to terminate the Lease would also be paid to Debtor's estate to fund a

portion of the plan. The result is the same in both instances because money will flow into

the estate regardless how I decide the assignment issue. The assignment decision is

therefore irrelevant as a matter of jurisdiction and substance because whichever way I

decide it, funds flowing from the Lease (or its termination) would be paid to and become

part of the estate.

My review of the law establishing this Court's jurisdiction, as presented by

the parties, also leads to the conclusion that I should decide the termination issue first.

Again, of course, the order in which I decide the substantive issues of assignment and

termination is academic.

## 2.  What Substantive Law Governs Interpretation of the Lease, Its Termination, and Its Alleged Assignment?

The Lease provides for the leasing or renting of certain floor space in the

lobby of Marriott Copley in Boston, Massachusetts. The Lease is silent on what

substantive law should apply to interpretation or enforcement of the terms of the Lease.

Section 19 of the Lease, however, provides as follows:

> 19.  Compliance with Laws. The Operator shall comply with all laws and
> ordinances and all rules, orders, and regulations of all governmental
> authorities and of all insurance bodies applicable to the Premises or to
> Operator's compliance with this Agreement.

30

The reference in Section 19 to compliance with the laws and ordinances and rules, orders, and regulations of governmental authorities applicable to the Premises strongly suggests that Debtor (Operator under the Lease) has been and is controlled by the law that applies to the Marriott Copley hotel (the Premises under the Lease).   Obviously, Marriott Copley is subject to the laws of the Commonwealth of Massachusetts and to the local ordinances, rules, orders, and regulations in its operation of the Boston hotel.  Although adherence to Massachusetts law is not expressly mandated by the language of the Lease, I conclude that the parties intended, through Section 19 of the Lease, to have Massachusetts law apply to their contractual relationship.

Massachusetts law governs operation of the hotel; Massachusetts substantive law, therefore, applies to interpretation of the Lease for space in the hotel. With no choice of law provision in the Lease, the parties' rights are determined by the local law of the state that, with respect to the issue at hand, has the most significant relationship to the transaction and the parties.  See Bushkin Assoc., Inc. v. Raytheon Co., 473 N.E.2d 662, 668 - 669 (Mass. 1985), citing Restatement (Second) of Conflicts. Furthermore, the parties agree in their briefs that the substantive law of Massachusetts applies.[24]

---

[24] In its first post-hearing brief, filed on April 2, 2010, Marriott Copley argues that Massachusetts law applies to the termination issue.  In its second post-hearing brief, filed on April 16, 2010, however, Marriott Copley argues that either Massachusetts or Pennsylvania law could apply to the assignment issue.  I reject the later argument.  Because Massachusetts law relates to and controls the Lease, Massachusetts law applies to the assignment issue.

I will therefore apply and consider the substantive law of Massachusetts to determine (1) the meaning of the terms of the Lease, (2) the effectiveness of the attempted termination of the Lease, and (3) whether the Lease was assigned.

## 3.  May I Order that the Lease Be Assumed by Debtor Subject to a Determination of Its Current Status by the Massachusetts State Court?

State court litigation about whether the attempted termination was effective and proper pursuant to the terms of the Lease is pending.  Although I could order the Lease assumed subject to that pending litigation, I will not do so primarily because both parties agree that I should not.  My belief to the contrary notwithstanding,[25] I will determine the legality and propriety of the Lease termination as part of this Opinion.

## 4.  What Does "Necessitates" Mean, According to Massachusetts Law, as that Term Is Used in Section 11 of the Lease?

Section 11 of the Lease provides that if a major renovation/reconstruction of the hotel lobby "necessitates a relocation or closing" of the Kiosk in the Marriott Copley lobby, Marriott Copley must use its best efforts to relocate the Kiosk to a comparable location within the hotel.  If relocation is not reasonably possible, Marriott Copley may terminate the Lease by giving Debtor sixty-days written notice.  If the termination is done properly, Marriott Copley's damages owed to Debtor would be limited as set forth in Section 11.  The parties agree (at least tacitly by their arguments)

---

[25] My contrary belief is stated in footnote 9, supra.

32

that the Lease speaks for itself and is a complete and integrated expression of their

agreement.  This case thus turns on interpretation of the Lease language, which

interpretation is a question of law.  Lexington Ins. Co. v. All Regions Chemical Labs,

Inc., 647 N.E.2d 399, 400 (Mass. 1995).  I should use justice, common sense, and the

probable intent of the parties to construe the meaning of the terms of the Lease.  Kotler v.

Spaulding, 510 N.E.2d 770, 772 (Mass. App. Ct. 1987).  This is not a surprising or novel

guideline − it is very similar to the principles that would guide me according to

Pennsylvania law.

Marriott Copley goes to some length to argue that the renovation was

necessary.  That argument misses the mark.  The issue is not whether the renovation is or

was necessary, but whether any such renovation, once the determination to proceed was

made, necessitated the relocation or closing of Kiosk.  Marriott Copley refers me to Finn

v. McNeil, 502 N.E.2d 557, 561-62 (Mass. App. Ct. 1987), as authority for its suggestion

that I look to a number of definitions of statutory uses of the word "necessary" to interpret

the term "necessitates" in the Lease.  Marriott Copley's reliance on Finn is misplaced.

The Finn court used a number of statutory and regulatory descriptions of

"capital improvements" for the definition of that term in a contract.  All of the definitions

to which the Finn court referred were within the same industry and usage as the

construction contract at issue therein.  Expansion of the Finn reliance on statutory

language to this case, in which "necessitates" is not confined to any particular profession

33

or industry, would be erroneous.  The court in Cosica v. Constructions Collaborative, Inc.,

No. 005404C, 2003 WL 22285312, at *3 (Mass. Super. Ct. July 25, 2003), condemned

the apples and oranges approach suggested by Marriott Copley.  The court rejected the

attempt by one of the parties to analogize different statutory terms and meanings to

establish the meaning of the term at hand.  Despite the warning in Cosica, Marriott

Copley refers me to court decisions relating to interpretations of statutory and regulatory

terms relating to the Telecommunications Act of 1996,[26] the Internal Revenue Code,[27] and

the Bankruptcy Code,[28] none of which are specifically germane to interpretation of the

terms of the Lease.[29]

Debtor presses a different definition of "necessary" – compelled, forced,

required – derived from the Merriam-Webster Collegiate Dictionary.  Rather than relying

upon the meaning of terms of wholly unrelated statutes, I agree with Debtor that I should

---

[26] Cellco Partnership v. F.C.C., 357 F.3d 88 (D.C. Cir. 2004); Prometheus Radio Project v. F.C.C., 373 F.3d 372 (3d Cir. 2004).

[27] Capital Video Corp. v. Commissioner of Internal Revenue, 311 F.3d 458 (1st Cir. 2002).

[28] Truck Drivers Local 807 v. Carey Transportation, Inc., 816 F.2d 82 (2d Cir. 1987); In re Korea Chosun Daily Times, Inc., 337 B.R. 758 (Bankr. E.D.N.Y. 2005).

[29] To the extent that I might consider statutes and regulations that relate to the hotel or hospitality industry to assist in defining "necessitates," Marriott Copley has not provided me with any such industry-specific guidance.  I do not suggest that any such reference would be appropriate under these circumstances; I merely note that Marriott Copley has mixed apples and oranges.

first look to the Lease to find the ordinary meaning of its terms.[30]  To determine the

ordinary meaning of terms in that context, I agree that my reference to a general-purpose

dictionary is appropriate.  My review of the Merriam-Webster Online Dictionary 2010

reveals a similar definition of "necessitate" to mean "to make necessary," "to require," "to

force," or "to compel,"[31] each of which comports with the meaning of the language of the

Lease.

       Finally, the Finn court also instructed that a court should, so far as

reasonably practicable, give a construction that will make the Lease an integrated, rational

business instrument to effectuate what appears to have been the intention of the parties.

Finn, supra, 502 N.E.2d at 561.  Accord Moore v. Galante, No. 200006014, 2002 WL

388216 at *3 (Mass. Super. Ct. Jan. 7, 2002).

       In the context of Section 11 of the Lease, I believe that the plain meaning of

its terms is as follows:  If Marriott Copley decided for any reason to proceed with major

renovation/reconstruction of the lobby, it could do so.  But Marriott Copley would be

obliged to show that it was required, forced, or compelled to close (or relocate[32]) the

Kiosk as a result of the renovation/reconstruction.  Marriott Copley has no power "to

---

[30] Finding the ordinary meaning of terms is particularly important in this case because the
Lease was negotiated largely by non-attorneys.  The lay parties who drafted the Lease would
naturally consider the everyday meanings of words rather than references to terms of art used in
the Telecommunications Act of 1996, the Internal Revenue Code, and the Bankruptcy Code.

[31] See http://www.merriam-webster.com/dictionary/necessitate.

[32] Marriott Copley made no attempt to relocate the Kiosk.

35

decide" whether to close[33] the Kiosk.  If Marriott Copley is able to "decide" to close or

not close the Kiosk, closing the Kiosk would not be proper because it would not have

been compelled, forced, or required by the renovation to do so.

In other words, Marriott Copley's decision to undertake major renovations

or reconstruction of its lobby could not be thwarted by Debtor; but Debtor's continued

use of the Kiosk at the same location in the lobby could only be thwarted by Marriott

Copley if it showed that relocating or closing the Kiosk was required, forced, or

compelled by the renovation.  This is the definition that I will use in my analysis and

discussion below.

## 5. What Does "Best Efforts" Mean, According to Massachusetts Law, as that Phrase Is Used in Section 11 of the Lease?

Section 11 of the Lease requires Marriott Copley to use its "best efforts" to

relocate the Kiosk if the renovation necessitated it.  Under Massachusetts law, a

requirement for a party to make its "best efforts" imposes a duty of good faith, Stabile v.

Stabile, 774 N.E.2d 673, 676 (Mass. App. 2002), implicitly qualified by a reasonableness

test.  Coady Corp. v. Toyota Motor Distributors, Inc., 361 F.3d 50, 59 (1st Cir. 2004).

Best efforts generally does not require unreasonable, unwarranted, or impractical efforts

and expenditures of time.  Macksey v. Egan, 633 N.E.2d 408, 413 n.16 (Mass. App. Ct.

---

[33] Section 11 of the Lease also provided for relocation of the Kiosk if necessitated.
Marriott Copley did not relocate the Kiosk, it terminated the Lease, thereby closing the Kiosk.

36

1994).[34] But the converse is true − best efforts requires, at the very least, reasonable, warranted, and practical efforts and expenditures of time. As the court stated in Stabile, 774 N.E.2d at 676, "we 'assume a construction of "best efforts" in the natural sense of the words as requiring that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom.'" (citing Macksey, 633 N.E.2d at 414).

Marriott Copley cited non-Massachusetts decisions in which the duty of best efforts was not breached if the proposed obligation was found to be impossible, impractical, or futile. See, e.g., Bartsh v. Northwest Airlines, Inc., 831 F.2d 1297, 1304 (7th Cir. 1987). As I noted above, I will consider only Massachusetts substantive law, although I regard the decision in Bartsh to be correct.

In this case, it is particularly important that the parties had amended the language of Section 11, changing the duty of Marriott Copley from using simply reasonable efforts to the higher standard of using best efforts.[35] The parties expressly agreed to this significant change in the level of the efforts required of Marriott Copley. The higher level of Marriott Copley's duty shows the parties' clear intentions that merely reasonable efforts would not satisfy this duty.

I conclude that the best efforts test required that Marriott Copley must first

---

[34] Debtor refers me to Macksey, but cites a definition of "best efforts" expressly rejected by the Macksey court.

[35] See Section II., B., 1., at pp. 11 - 12, supra.

have acted in good faith.  Second, Marriott Copley must have "put its muscles to work . . .

with full energy and fairness," Stabile, 774 N.E.2d at 676, to relocate the Kiosk to a

comparable location within the hotel.

## 6.  What Determines the Effectiveness, According to Massachusetts Law, of an Assignment of an Agreement To Provide Space in a Hotel Lobby?

### a.  Massachusetts statute of frauds.

The Massachusetts statute of frauds requires that the creation and

assignment of an estate or interest in land be (1) in writing and (2) signed by the grantor

or his attorney.  Mass. Gen. Laws. Ann, ch. 183, §3 (West 2010).   The statute provides:

"[A]n estate or interest in land created without an instrument in writing signed by the

grantor or by his  attorney shall have the force and effect of an estate at will only, and no

estate or interest in land shall be assigned, granted or surrendered unless by such writing

or by operation of law."  See also Tage II Corp. v. Ducas (U.S.) Realty Corp., 461 N.E.2d

1222, 1225 (Mass. App. Ct. 1984)(assignment of a lease must be in writing).

Marriott Copley cites Cheswell, Inc. v. Premier Homes and Land Corp., 326

F. Supp. 2d 201, 202 (D. Mass. 2004), for the proposition that, under Massachusetts law,

an assignment need not be in writing to be enforceable.   Cheswell involved a general

assignment of a promissory note, a ground lease, and a mortgage.  The Magistrate Judge

first noted that "assignments need not be in writing to be enforceable by the court,"

explaining that the party's assertion to the contrary was based on a 1909 case referring to

a Massachusetts statute that had been repealed in 1920. The repealed statute dealt with

assignment of legal choses in action, not interests in land, and was not the Massachusetts

statute of frauds cited above. The court then stated that "in the absence of an applicable

statute[,] the manifestation of present intention [to assign] need not be in writing."

Inexplicably, the Cheswell court did not discuss the Massachusetts statute of frauds that

relates to interests in land. Moreover, none of the cases cited by the Cheswell court for its

basic premise considered an assignment of an interest in land. Instead, the cited cases

involved assignments of passenger and freight receivables[36] and assignments of account

receivables,[37] to which the Massachusetts statute of frauds dealing with interests in land

does not apply.

   Cheswell provides me with no guidance because the court prefaced its

ruling on its statement that "in the absence of an applicable statute, the manifestation of

present intent to assign need not be in writing." In the case now before me, I have an

"applicable statute," i.e., the Massachusetts statute of frauds, which requires a writing for

an assignment of an interest in land to be enforceable. The interest being assigned in the

Cheswell case involved interests in land as well (a ground lease and mortgage), so the

statute of frauds argument would seem to apply in Cheswell. But for some reason, the

Cheswell court neither considered nor discussed the Massachusetts statute of frauds.

---

[36] In re Gull Air, Inc., 90 B.R. 10 (Bankr. D. Mass. 1988).

[37] Kagan v. Wattendorf & Co., 3 N.E.2d 275 (Mass. 1936).

39

Whatever its analysis, I do not regard Cheswell as indicative of Massachusetts law because I do not agree with its rationale and legal foundation.

Marriott refers me to Section 324 of the Restatement (Second) of Contracts to support its argument that an assignment of a lease need not be in writing. Section 324 specifies that an assignment of a right may be made orally, except as provided by statute or contract. The second comment under Section 324, however, explains that the statute of frauds is one of the statutes that fits within the exception. Section 324 is therefore not germane in Massachusetts for assignments of interests in real property, because Massachusetts has a statute of frauds that applies to such assignments.

I also reject City of Boston v. Aetna Life Ins. Co., 506 N.E.2d 106 (Mass. 1987), and Cosmopolitan Trust Co. v. Leonard Watch Co., 143 N.E. 827 (Mass. 1924) (both cited by Marriott Copley), for the proposition that an assignment of a lease need not be in writing. These two cases are clearly distinguishable because they involved an assignment of rights under a health insurance policy (City of Boston) and an assignment of a promissory note (Cosmopolitan Trust); the statute of frauds does not apply to either of those types of assignment. Debtor did not discuss any of these cases or this argument in its briefs.

Massachusetts law, particularly its statute of frauds, codified at Mass. Gen. Laws Ann., ch. 183, §3, requires that an assignment of an interest in real property be in writing.

## b.  The writing required to satisfy the Massachusetts statute of frauds need not be a formal document.

A writing that might satisfy the statute of frauds need not be a formal document if it reasonably (1) identifies the subject matter of the contract, (2) indicates that a contract has been made between the parties, (3) states with reasonable certainty the terms of the unperformed promises in the contract, and (4) is signed by or on behalf of the party to be charged.  Zwidra v. Mazurek, No. 07-5631-F, 2009 WL 3593498 at *3 (Mass. Super. Ct. Aug. 14, 2009).[38]  The memorandum need not be made or executed contemporaneously with the actual contracting.  Whether a writing satisfies these requirements is a question of law for me to determine.

The plaintiff in Zwidra was a private lender attempting to collect a loan that had not been memorialized in writing.  Both the creditor and the debtor acknowledged that the loan had, in fact, been made.  The debtor did not contend that no loan existed; she was depending on the statute of frauds as one of her defenses to enforcement.  But the debtor in Zwidra had listed the loan as her liability on a financial statement she had filed with a court in a prior, unrelated divorce proceeding.  The divorce court had designated repayment of this debt to the debtor, as her obligation alone, in its final judgment of divorce.  The court in Zwidra ruled that "[the debtor's] financial statement and the

---

[38] Zwidra addressed the statute of frauds, not in the context of an interest in real estate, but for an agreement that would not be performed within a year after its making.

41

Suffolk County Probate and Family Court judgment satisfy the statute of frauds."

Debtor did not address the Zwidra case or this argument in its briefs but I find the facts of Zwidra sufficiently distinguishable to render Zwidra inapposite.[39]

## c.  Application of the statute of frauds to an agreement that is a license, not a lease, for the use of real estate.

In Baseball Pub. Co. v. Bruton, 18 N.E.2d 362, 363 (Mass. 1938), the court explained the difference between a lease and a license for the use of real estate:  "[A] lease of land conveys an interest in land, requires a writing to comply with the statute of frauds though not always a seal . . . and transfers possession."  The court went on to explain:  "A license merely excuses acts done by one on land in possession of another that without the license would be trespasses, conveys no interest in land, and may be contracted for or given orally."  The license to use the land of another is revocable at the will of the landowner.  Marriott Copley refers me to the Baseball Pub. decision in support of its argument.

In Baseball Pub., the defendant had signed a document that gave the plaintiff the exclusive right to maintain an advertising sign on the wall of a building owned by defendant.  The agreement gave the plaintiff the "'exclusive right and privilege to maintain advertising sign . . . on wall of building,' but leaving the wall in the possession of the owner with the right to use it for all purposes not forbidden by the

---

[39] See pp. 59 - 60, infra.

42

contract and with all the responsibilities of ownership and control." Id. at 363-64. The

defendant removed the sign and the plaintiff sued for specific performance.

The court found that the parties' agreement was not a lease because it left

the wall in the possession of the defendant, with the right to use it for all purposes not

forbidden in the contract and leaving the defendant with all of the responsibilities of

ownership. The court also found, however, that the parties' agreement was not a license

because it granted the plaintiff the exclusive right to maintain the sign on the defendant's

wall. Instead, the court ruled that the agreement was an easement in gross, which is an

interest in land and is required to be in writing according to the statute of frauds.

Marriott Copley cites Willette v. Pilotte, 109 N.E.2d 840 (Mass. 1953), for

its proposition that the Lease is not a lease, but is a license. In Willette, however, the

licensee was permitted to display and sell Christmas trees anywhere at a gas station that

did not interfere with the business of the gas station. Because the Christmas tree seller

did not have exclusive possession of any defined spot, the agreement was a license and

not a lease. Willette is inapplicable in this matter because, among other reasons, the

location of the Kiosk was fixed and permanent (until the Lease expired).

Marriott Copely also relies on In re Harbour House Operating Corp., 26

B.R. 324 (Bankr. D. Mass. 1982), to support its argument that the parties' agreement

created  a license and not a lease. The court in Harbour House described the distinction

between a lease and a license as follows:

43

> When an owner of an estate in land grants to another the right to possession of the property, retaining a reversion, the transaction is a lease. . . .   If the instrument does not grant possession, but grants only the right to use the premises, then the instrument is a license and not a lease. . .  . The usual test of whether a document is a lease is whether the instrument gives the so-called lessee exclusive possession of the premises."

Id. at 328 (citations omitted).  According to the Harbour House court, if the document gives exclusive possession, it would be a lease; if it does not, it would be a license.  The court then noted that the parties' agreement did not grant the lessee exclusive possession and did not use any of the usual terms of conveyance, such as grant, let, lease or demise.[40] The court specifically found that, to accommodate the requirements of Massachusetts liquor license law, the agreement between the parties was "carefully drafted not to be a lease."  Id. at 328 (emphasis added).  Instead, the document states that the putative lessee shall provide operational and consulting services in connection with the conduct of the food, beverage, entertainment, and pool operations of the lounge.  Based on the terms of the agreement and the parties' deliberate effort to avoid creating a lease, the court found that the parties' agreement was not a lease, but was a management contract.  Id. at 329.

Debtor responded vigorously and negatively to Marriott Copley's assertion that the Lease is not a lease.  Debtor listed numerous instances in which Marriott Copley argued that the Lease is a lease, never mentioning that it might be a license:

> The Marriott objected to the Debtor's Motion to Assume by stating

---

[40] The court noted the absence of the terms "grant," "lease," "let," or "demise," but went on to say that the failure to use those terms was not determinative.

44

that it "objects to the proposed assumption of its two non-residential real property leases with the Debtor." See Exhibit "A", Objection at page 1. Marriott admitted that it "leases to the Debtor certain space in each of the lobbies of the hotels." See Exhibit "A", Objection, page 2 at ¶ 6. Marriott further admitted that the "term of the lease is seven (7) years after its commencement date." See Exhibit "A", Objection, page 2 at ¶ 7. The evidentiary hearing in this matter arose from Marriott's position that the "Lease was validly terminated by Marriott . . . such that there is no unexpired lease for the Debtor to assume." See Exhibit "A" Objection, page 5 at ¶ 17. Moreover, Marriott acknowledged that if the Debtor was permitted to assume lease, the "Debtor, upon assumption, would be bound by the terms of the lease in their entirety." See Exhibit "A", Objection, page 6 at ¶ 19. Lastly, Marriott objected to the assumption because, the "Debtor is not able to demonstrate adequate assurance of future performance as required to assume a non- residential real property lease." See Exhibit 'A", Objection, page 8 at ¶ 23.

Combined Motion of the Debtor for (I) Expedited Consideration, Shortened Time and Limited Notice, and (II) for Entry of an Order Striking Exhibits, Defenses, and Statements in Marriott Hotel Services, Inc. d/b/a Marriott Boston Copley Place Hotel's Post Hearing Briefs and Post Hearing Reply Brief, p. 5, filed on May 11, 2010.

Debtor's argument is correct. Marriott Copley has repeatedly referred to the Lease as a lease throughout its pleadings, briefs,[41] and presentation of evidence in both hearings in this dispute. I agree with Debtor that Marriott Copley's reversal of position and declaration that the Lease is a license may be disingenuous. Nevertheless, I will not

---

[41] In its brief filed in this matter on April 2, 2010, Marriott Copley referred to the concession agreement as either the Agreement (seven references), the Concession Agreement (eight references), or the Lease (twenty references). Until April 16, 2010, Marriott Copley never referred to the Lease as a license.

45

reject the lease/license argument out of hand, but consider it in more detail below.[42]

## d.  Estoppel of a party pleading the statute of frauds.

A party can be estopped from asserting the statute of frauds as a defense if the other party detrimentally relied upon or partially performed the oral agreement. See Nessralla v. Peck, 532 N.E.2d 685, 688-89 (Mass. 1989); Fisher v. MacDonald, 127 N.E.2d 484, 486 (Mass. 1955); and Fitzsimmons v. Kerrigan 404 N.E.2d 127, 128 (Mass. App. Ct. 1980).   Even if the Lease were a lease for which the statute of frauds would ordinarily require that an assignment be in writing, Marriott Copley argues, the statute of frauds cannot be used as a defense.   Marriott Copley claims that Debtor should be estopped from relying on the statute of frauds because Marriott Copley and Landau Hotel have partially performed their obligations under the assignment and the parties are estopped from undoing the assignment.

Marriott Copley never knew about the assignment and has not demonstrated in any way that it suffered some prejudice as a result of the alleged assignment.  It therefore cannot rely on an estoppel argument.   No law of estoppel applies to this matter.

---

[42] See pp. 60 - 61, infra.

# B. ANALYSIS OF THE TESTIMONY AND EXHIBITS RELATING TO TERMINATION OF THE LEASE.

The testimony and exhibits presented by both Marriott Copley and Debtor showed the meager efforts of Marriott Copley to fit the Kiosk into its plans for the renovation of the lobby after the plans were finalized. The testimony and exhibits make it abundantly clear that management for Marriott Copley was mistaken about its obligations and options under Section 11 of the Lease. Marriott Copley could only close the Kiosk if it was necessitated by the renovation and relocation of the Kiosk was not reasonably possible. Marriott Copley was also obliged to use its best efforts to relocate the Kiosk to some other location in the lobby. To the contrary, Marriott Copley made no effort to do so. Marriott Copley management (Mr. Giblin and others) badly misinterpreted their obligations and options under Section 11 of the Lease. The correct analysis of Section 11 of the Lease is that it establishes a basis for closing the Kiosk and a calculation for liquidated damages only upon the satisfaction of certain conditions. Because Marriott Copley personnel believed that Section 11 provided a unilateral buyout clause, they did not consider, trying to maintain or relocate the Kiosk.

## 1. Marriott Copley's Incorrect Interpretation of the Operation of Section 11 of the Lease.

Mr. Giblin testified at least three times about the interpretation of Section 11 of the Lease by Marriott Copley staff, management, and professionals. Marriott

47

Copely personnel regarded Section 11 as a no-fault termination and unilateral buyout

option. When Marriott Copley decided to renovate its lobby, therefore, they believed that

they had no obligation to do anything. Marriott Copley personnel thought they could

simply terminate the Lease (they thought) and pay a liquidated amount (calculated by the

Section 11 formula). The no-fault "buyout option" in Section 11 of the Lease was

assumed to provide Marriott Copley with the unilateral ability to terminate the Lease and

pay a calculated sum of money as buyout damages. Other than payment of the buyout,

Marriott Copley's management thought that the only condition was that they give Debtor

at least sixty (60) days notice of termination. As a result of this wholly incorrect

interpretation of Section 11 of the Lease, Marriott Copley undertook no effort whatsoever

to relocate the Kiosk. Mr. Giblin and others mistakenly believed that they had no need to

do anything about the Kiosk because Marriott Copley could simply terminate the Lease,

exercise the "buyout option," pay a calculated sum as liquidated damages, and be rid of

Debtor and its Kiosk. They were wrong.

## 2. Actual Operation of Section 11 of the Lease.

Section 11 of the Lease operates as a "safe harbor" for termination and as a

liquidated damage provision, effective and calculable only upon the satisfaction of certain

prerequisites. Six conditions must have been satisfied: (a) Marriott Copley must have

decided to renovate or reconstruct the lobby of the hotel – it did; (b) the renovation or

reconstruction must be "major" – it was; (c) the renovation must have necessitated

48

closing the Kiosk at its present site — it did not do so;[43] (d) Marriott must have used its

best efforts to relocate the Kiosk to a comparable site within the hotel — it did not do so;

(e) relocation of the Kiosk could not have been reasonably possible — it might have

been;[44] and (f) Marriott Copley must have terminated the Lease upon at least sixty (60)

days notice — it did.  Upon satisfaction of the six conditions, the Lease could be

terminated safely and the liquidated damage calculations in Section 11 would take effect.

The termination was improper and fixing and limiting the damages did not take effect,

however, because three of the pre-conditions were not satisfied.  A more detailed, term by

term, review of the six conditions follows.

### a.  Major renovation/reconstruction.

The first two of the six conditions of Section 11 were satisfied.  Marriott

Copley decided to engage in a major renovation or reconstruction of its hotel lobby.[45]  If

all other conditions in Section 11 of the Lease had been satisfied, the liquidated damages

provision would have been effective.

---

[43] More accurately, Marriott Copley failed to provide evidence that closing or relocating the Kiosk was necessitated by the renovation.

[44] Marriott Copley failed to provide evidence that relocation of the Kiosk was not reasonably possible.

[45] Without question, Marriott Copley was renovating its lobby.  Although I was given no scale against which I might measure the magnitude of the lobby renovation, I have no difficulty in concluding from the exhibits and testimony presented to me at the hearing that it was sufficiently extensive to qualify as "major."

49

## b. Necessity of closing the Kiosk.

The third of the six conditions was not satisfied because Marriott Copley

failed to prove that its lobby renovation necessitated closing[46] the Kiosk. Marriott Copley

believed that the renovation itself was something it needed to do because it wanted more

meetings, larger crowds, and more customers. All businesses hope to grow. Marriott

Copley reversed its prior policy of having retail space in its lobby and decided that its

lobby should have no retail space. It decided to renovate its lobby toward that end.

More specifically to Section 11 and its requirements, Marriott Copley

presented nothing that showed the necessity of total removal of the Kiosk from the lobby

because of the renovation. No evidence showed the financial necessity of removing all

retail space from the lobby as a result of the renovation.[47]   No evidence showed that the

renovation of the lobby necessitated that the Kiosk be closed. Marriott Copley, through

its management, staff, and professionals, had decided early in the process that the

renovation plans would eliminate all retail space, including the Kiosk. Nothing in the

record, however, suggests that the renovation would fail or be materially less successful if

the Kiosk remained where it was or was relocated somewhere within the lobby. Because

Marriott Copley was not required, forced, or compelled by the renovation to eliminate the

---

[46] See note 33, supra.

[47] The only financial information in evidence was limited to exhibits that included
statements of persons who did not testify about the need to increase meeting space and did not
relate to closing the Kiosk. No evidence showed that some minimum of open lobby space must
be maintained.

Kiosk, but instead, "decided" to do so, closing the Kiosk was not necessitated.

More importantly, the renovation actually reduced the size of the lobby. Marriott Copley's efforts to increase meeting and pre-meeting space led it to sacrifice lobby size. Looked at another way, Marriott Copley found it acceptable that increasing meeting and pre-meeting space would reduce the size of the lobby. Similarly finding space in the lobby for the Kiosk might have further reduced the lobby size.[48]  Yet Marriott Copley chose to reduce its lobby size to increase meeting and pre-meeting space, but refused to make any attempt to accommodate the Kiosk. This is unacceptable under Section 11 of the Lease.

Marriott Copley argues at page 14 of its post-hearing brief (filed on April 2, 2010) that "it is <u>undisputed</u> (Marriott Copley's emphasis) that the Hotel had determined" that it needed to add meeting room space to remain competitive with other Boston convention hotels. I am then referred to page 113[49] of the transcript its counsel had prepared. That portion of the transcript, pages 113 and 114, reflects fairly the actual testimony recorded in the audio CD at 2:53:34 - 2:56:25 — the CD being the official record of the December 18, 2009 hearing.

---

[48] No definitive statement about relocating the Kiosk can be made because Marriott Copley had decided immediately and prematurely, without consulting the architect, that all retail space would be eliminated.

[49] Marriott Copley's references in its brief to supporting page numbers of its transcript are incorrect. At some time, the typists appear to have changed page one of the transcript to page two because they inserted a table of contents as page one. This rendered all references to pagination incorrect.

First, the argued language is only vaguely mentioned in that portion of the transcript. Mr. Giblin discusses generally that Marriott Copley has less meeting room than other competitive hotels, and he noted that they were at a competitive disadvantage. But he did not say that, to remain competitive, they were required, forced, or compelled to increase the meeting space. More importantly along these lines, both Mr. Giblin and Mr. Stanislaski also said that even with the renovation/reconstruction that Marriott Copley undertook, it remained short on pre-meeting space. 2:19:18 - 2:20:27 (and Exhibit D-23); 4:34:37 - 4:34:48. I had no evidence that the limited, sub-standard increase in meeting space that Marriott Copley experienced from the renovation was sufficient for it to become any more competitive.

Second, Marriott Copley once again confuses the application and effect of the term "necessitates." Section 11 of the Lease does not require Marriott Copley to show that the renovation or reconstruction was necessitated. It must show that the closing of, and failure to relocate, the Kiosk was necessitated by the renovation.

Finally, the truest interpretation of the parties' language in Section 11 is that Marriott Copley could not simply "decide" to eliminate retail space.[50] It must show that the renovation required, forced, or compelled it to eliminate all space for the Kiosk.

The long and the short of this element is that Marriott Copley failed to

---

[50] I must avoid any interpretation of part of the Lease that renders other provisions meaningless. See Lexington Insurance Co., v. All Regions Chemical Labs, Inc., 647 N.E.2d 399, 408 (Mass. 1995).

prove that closing, and not relocating, the Kiosk was necessitated.

## c. Best efforts to relocate the Kiosk to a comparable position.

Marriott Copley failed to satisfy the fourth of the six conditions because the clear and repeated evidence showed that it had made no effort whatsoever to relocate the Kiosk before attempting to terminate the Lease.[51] Early in the process, before the plans were finalized, the architect might have developed plans that could have relocated the Kiosk. But the evidence established that Marriott Copley requested no such effort. Also, Debtor was not brought into the picture until September 15, 2008, after the structural components of the plan had been irrevocably finalized. Even when Mr. Hyman first learned about the renovation, he was not asked to contribute to any effort to relocate the Kiosk, but was simply told that Marriott Copley terminated the Lease unilaterally. Before the plans were finalized, when the architect might have been able to find space for the Kiosk somewhere, he did not try to do so because he had been told flatly to eliminate all retail space. Relying entirely on their misinterpretation of Section 11 of the Lease, Marriott Copley management made no effort at all to relocate the Kiosk. They intended only to exercise their imagined "buyout" provision in the Lease.

The post-termination consideration of alternative locations suggested by

---

[51] Counsel for Marriott Copley refers to page 103 (meaning page 104) of the transcript as establishing general discussion about retaining retail space. I do not accept that interpretation of the testimony. Pages 103 and 104 of the transcript (which err in some respects in accurately tracking the audio CD) establish that Marriott Copley personnel believed that they need not accommodate Debtor pursuant to the Lease, because they had a buyout that Marriott Copley could exercise. 2:32:01 - 2:34:39. See Section III., B., 1., at pp. 46 - 47, supra.

Mr. Hyman was admittedly a meaningless "exercise." Early in the process, Marriott

Copley decided to eliminate all retail space without consulting Debtor, thereby exhibiting

a lack of good faith. When management and its professionals walked the premises after

Mr. Hyman's November 25, 2008, and December 11, 2008, letters, and when the engineer

and the architect looked at the suggested alternatives, the structural components of the

plan had been completed and could not be changed. Only after the initiation of this

litigation did counsel for Marriott Copley direct the architect to actually plot out and

analyze Mr. Hyman's suggestions. This after-the-fact review clearly does not satisfy the

obligation to use best efforts that is prescribed by Section 11 of the Lease. Marriott

Copley made no effort to relocate the Kiosk before the plans were finalized, when it

might have been possible to do so.

Marriott Copley believed that its mantra of no retail space in the new lobby

relieved it of all obligation to relocate the Kiosk. It was and is mistaken. When a party to

a contract has the express obligation to devote good faith and best efforts to perform some

task, it cannot simply say that the task at issue does not fit within its goals and may be

ignored with impunity. Marriott Copley had the contractual duty to use its best efforts to

relocate the Kiosk. Assuming away that obligation, as did Marriott Copley, does not

satisfy that duty. Marriott Copley fell short of even beginning to satisfy the best efforts

condition under Section 11 of the Lease.

### d. Relocation of the Kiosk must not have been reasonably possible.

This element is closely associated with the required use of best efforts. Marriott Copley failed to establish the fifth of the six conditions because it provided no evidence that relocation of the Kiosk, before the plans had been finalized structurally, was not reasonably possible. The only quasi-attempt (a make-show effort at best) of Marriott Copley management, staff, or professionals to relocate the Kiosk occurred only after the attempted termination and after the plans had been structurally finalized. Too little; too late.[52] Marriott Copley offered no testimony or exhibits to show that relocation of the Kiosk was not reasonably possible before the plans were finalized and failed to prove that relocating the Kiosk was not reasonably possible.

### e. Ninety (90) days notice of termination was given.

As noted above, the sixth of the six conditions of Section 11 of the Lease, sixty-day notice of termination, was satisfied by the ninety-day notice of termination in the September 15, 2008 letter.

## 3. The Attempted Termination Breached the Lease.

Marriott Copley attempted to terminate the Lease by its September 15, 2008 letter to Debtor. The question is whether the termination was properly and effectively

---

[52] See Pennsylvania Agr. Co-op. Marketing Ass'n v. Ezra Martin Co., 495 F. Supp. 565, 568 n. 7 (M.D. Pa. 1980).

55

undertaken according to the terms of Section 11 (or possibly another section) of the Lease or if the termination constituted a breach.  The Lease provided Marriott Copley with certain, very limited, grounds for termination.

First, if Debtor failed to operate in a first-class manner conforming to Marriott Copley's reasonable and non-discriminatory standards, Marriott Copley could have, on ten-days notice, terminated the Lease.[53]  Second, the term of the Lease ends seven (7) years after its Commencement Date.[54]  Third, Marriott Copley's termination of the Lease could not have been undertaken pursuant to Section 11 because the conditions set forth in Section 11 were not satisfied.  Fourth, the Lease would terminate immediately upon a condemnation, eminent domain, or another taking.[55]  Fifth, the Lease could be terminated upon fire or other casualty.[56]  Sixth, the Lease could be terminated upon an assignment of the Lease not specifically permitted according to the Lease.[57]

Marriott Copley presented nothing that showed or proved that it had

———————————

[53] Section 1(b) of Lease, Exhibit D-6.

[54] Section 2(a) of Lease, Exhibit D-6.  Although capitalized in the Lease, "Commencement Date" does not appear to have been defined anywhere.  Because this issue is not before me, I do not find, but I note, that it appears that the Commencement Date is probably the date the Lease was made and entered, which appears to be as of February 6, 2004.  The Lease will therefore terminate under its own terms on February 6, 2011.

[55] Section 13 of Lease, Exhibit D-6.

[56] Section 14 of Lease, Exhibit D-6.

[57] Section 17 of Lease, Exhibit D-6.  I find and conclude in this Opinion that the Lease was not assigned and Section 17 is therefore inapplicable.

properly terminated the Lease under any provision of the Lease.  In particular, Marriott

Copley failed to satisfy the conditions in Section 11 and, therefore, the liquidated

damages provisions in Section 11 do not apply.  I find and conclude that Section 11 of the

Lease does not limit Debtor's damages arising from Marriott Copley's wrongful attempt

to terminate the Lease.[58]

---

[58] Marriott Copley's attempt to terminate the Lease may or may not have caused Debtor
damages.  The Lease is silent about defaults and wrongful termination.  I will not, at this time,
comment further on possible damages.  See footnote 8, supra.

# C.  ANALYSIS OF THE TESTIMONY AND EXHIBITS RELATING TO ASSIGNMENT OF THE LEASE.

## 1.  No Written Assignment of the Lease Exists.

Marriott Copley failed to produce a written assignment of the Lease at the February 19, 2010 hearing.  Debtor's principal, Mr. Hyman testified that Debtor did not assign the Lease and has no written assignment of the Lease.  Mr. Hyman also directed Debtor's counsel to produce documents demanded by Marriott Copley's subpoena to Debtor.  They had no written assignment of the Lease.  No written assignment was produced by anyone.  I find that Mr. Hyman's testimony that he did not execute a written assignment of the Lease was truthful and credible.  I find and conclude that no written assignment exists or existed.[59]

Marriott Copley goes on to argue, however, that a formal written assignment is not required[60] and sufficient valid, circumstantial, written indicia of Debtor's intent to assign the Lease has been shown to satisfy the statute of frauds.  The primary indicia of written intent relied upon by Marriott Copley are (1) Debtor's Statement of Financial Affairs, in which Debtor states that the Lease had been transferred

---

[59] I will address below my further belief and finding that no assignment of the Lease, whether oral or written, occurred.

[60] See discussion at pp. 41 - 42, supra.

to Landau Hotel and (2) a November 28, 2008 City of Boston Business Certificate in
which Mr. Hyman states that Landau Hotel was operating the Kiosk at the Marriot
Copley. The second item – who operates the Kiosk at the Marriott Copley is easily
dispensed.

The way Debtor did business (rightly, wrongly, or otherwise) was to have
inter-woven affiliates run the operations and finances of the stores without regard to
corporate identity. The designation on the Boston Business Certificate, while non-trivial,
does not indicate Debtor's intent to assign the Marriott Copley Lease. This falls into the
category of an affiliate performing some of the administrative or financial duties of a
related entity. Performing those duties, such as paying the rent or providing required
government forms may blur inter-corporate lines, but it does not make the related
company an assignee. See Ames v. B.C. Ames Co., 140 N.E.2d 654, 656 (Mass. 1957).

The identification of the Marriott Copley Lease as having been assigned to
Landau Hotel in Paragraph 10 (Exhibit 10a) of Debtor's Statement of Financial Affairs
might be offered as proof of an after-the-fact memorialization of an assignment of the
Lease. But the mere act of listing the Lease among the assigned/transferred leases in
Paragraph 10 does not provide a writing that satisfies the statute of frauds. In Zwidra, the
parties had agreed that the debt existed. The after-the-fact writing and state court
judgment endorsing the writing merely satisfied the statute of frauds. The writing and
judgment therefore memorialized a debt that the parties plainly acknowledged. That is,

59

the parties had acknowledged and admitted the obligation, but the debtor contested the

enforceability of the debt based upon the statute of frauds. The role of the writings was to

provide written support for the admitted debt, not to establish that the debt existed.

I therefore find and conclude that no written assignment of the Lease exists,

whether as a single, formal assignment document or as a collection of various documents

that, taken together, show an assignment. An assignment of the Lease, if one existed,

would not be binding because of the statute of frauds.

## 2.  The Concession Agreement Was a Lease, Not an License, and Required a Writing for Assignment.

Marriott Copley now claims that the Lease is actually a license and not a

lease. I disagree. Although as noted in <u>Baseball Pub.</u>, 18 N.E.2d at 364, and in <u>Harbour</u>

<u>House</u>, 26 B.R. at 328 (both of which are cited by Marriott Copley), the reference to an

agreement as a "lease" is not finally controlling or determinative, Marriott claims that the

Lease is actually a license because it is called a Concession Agreement, not a lease.

Marriott Copley ignores the following express language in the Lease:  (1) "Marriott . . .

hereby leases[61] to [Debtor] that certain space . . .." - Section 1(a) of the Lease; (2) the

words "rent" or "rental" (and not "license fee") are used in the Lease more than a dozen

times; (3) the Lease refers to "reletting[62] the premises" - Section 17(b); (4) the Lease

---

[61] The verb "lease" was noted in its absence in <u>Harbour House</u>. <u>Id.</u> at 328.

[62] The verb "let" was also noted in its absence in <u>Harbour House</u>. <u>Id.</u> at 328.

refers to Debtor as a "tenant" - Section 20; (5) until preparing its brief on the assignment issue, Marriott Copley never referred at any time, in any way, to the Lease as a license; and (6) in prior pleadings with this Court, Marriott Copley referred to the Concession Agreement as a lease.[63]  If it walks like a duck, swims like a duck, quacks like a duck, looks like a duck, and is repeatedly called a duck by its owner, it is a duck.[64]

The Lease requires that Debtor use, occupy, and continuously maintain the Premises. Marriott Copley reserved no right of co-possession, but did reserve a right to change the Premises only if it did not unreasonably interfere with Debtor.   Marriott Copley also reserved the right of inspection.  The lease of space to Debtor was for its exclusive use and continuous occupancy for a fixed term of years.  The obligation of Debtor to sell only jewelry, accessories, and objects d'art does not constitute any untoward limitation on Debtor.  To the contrary, such limitations, as well as many other provisions in the Lease, are typical in leases of space for retail stores.

Upon the facts and law discussed above, I find and conclude that the Lease is a lease and is not a license.  A writing is required for any assignment to be effective. No writing exists and therefore no assignment, were I to find that one existed, would be valid.

---

[63] See p. 44-45, supra.

[64] See U.S. v. Boylan, 898 F.2d 230, 241 (1st Cir. 1990) citing Carroll v. Capalbo, 563 F. Supp. 1053, 1058 (D.R.I. 1983); Kali Seafood, Inc. v. Howe Corp., 887 F.2d 7, 10 (1st Cir. 1989) citing Carroll v. Capalbo.

### 3.  The Lease Was Not Assigned.

Mr. Hyman testified credibly that he did not intend to have Debtor assign the Lease.  He explained that the assignments of some other leases had been done with an awareness that Debtor might need to file for bankruptcy protection.  Debtor wanted all of the leases without difficulties to be assigned to affiliates.  Leases with litigation, default, termination, or other problematic issues would stay in Debtor so that possible bankruptcy would stay any litigation.  Mr. Hyman explained that he had not realized that the Lease was listed in Paragraph 10 of the Statement of Financial Affairs.  He readily admitted that he had signed the Statement and that he had skimmed it before signing.  But the inclusion of the Marriott Copley Lease in Paragraph 10, he testified credibly, was a mistake.

In a company such as Debtor, with many dozens of leases for retail locations throughout New England and the Middle Atlantic, Southern, and Midwestern states, miscommunication is unfortunate, but understandable.  None of the mistakes that Mr. Hyman acknowledged constitute the creation of an assignment of the Lease.  The inter-company transfers, journal entries, and attribution of revenue and expenses might be unacceptable for a public company.  But for a closely held company owned and controlled by a single individual, I do not regard the mistaken references as proof of some nefarious attempt to hide an assignment of the Lease.

I find and conclude that no assignment of the Lease to Debtor's affiliate or to any other entity occurred, whether written or oral.

# IV.  CONCLUSION

The order in which I decide the substantive issues of termination and assignment is academic.  I will decide the termination issue first because I believe the termination issue affects Debtor's estate more significantly than whether the Lease was assigned.  Resolution of this dispute, of course, would not change were I to consider the assignment issue before termination.

Marriott Copley's interpretation of Section 11 of the Lease as providing a unilateral buyout option was and is wrong.  For all of the reasons discussed above, I find and conclude that Marriott Copley failed to terminate the Lease with Debtor in accord with Section 11 of the Lease.  Specifically, Marriott Copley failed to prove that:  (1) Elimination of the Kiosk from the lobby was necessitated by the lobby's renovation; (2) Marriott Copley used its best efforts to relocate the Kiosk; and (3) relocation of the Kiosk was not reasonably possible.  None of these conditions were proven.  Marriott Copley's attempt to terminate the Lease was not done under Section 11 or any other section of the Lease, but was a breach of and violated the Lease.

Debtor did not assign the Lease to Landau Hotel or to any other affiliated or unaffiliated entity.  The Lease remained and remains in the Debtor's Chapter 11 estate as a lease of space for its Kiosk in the lobby of the Marriott Copley hotel.  The Lease may be and shall be assumed in this Chapter 11 bankruptcy reorganization.

I will therefore issue the accompanying Order, through which I grant the

Assumption Motion insofar as the Marriott Copley Lease is concerned. I will also order

that the Lease is assumed by Debtor.


DATE:   May 28, 2010                              BY THE COURT


                                                 _____
                                                 RICHARD E. FEHLING
                                                 U.S. BANKRUPTCY JUDGE